**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Joshua R. Wilner (SBN 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
       jwilner@bursor.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AVA HOFFMAN, SHANTE PIERRO and DANIELA ZAMOR, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>      v.<br><br>FITON, INC.,<br><br>                    Defendant. | Case No.  2:24-cv-9105<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

## **TABLE OF CONTENTS**

**PAGE**

NATURE OF THE ACTION ................................................................ 1

THE PARTIES ................................................................................. 2

JURISDICTION AND VENUE .......................................................... 2

FACTUAL ALLEGATIONS ............................................................... 3

    I.    THE VPPA AND THE CIPA PROTECT CONSUMER PRIVACY ............................................................................. 3

        A.    History And Overview Of The VPPA ................................. 3

        B.    History And Overview Of The CIPA ................................. 4

    II.    DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER ................. 6

    III.    DEFENDANT INTENTIONALLY AND KNOWINGLY DISCLOSES APP USERS' PERSONALLY IDENTIFIABLE INFORMATION, VIDEO VIEWING INFORMATION, AND PERSONAL HEALTH INFORMATION TO AMPLITUDE AND BRAZE ................................................................................. 7

        A.    Testing Reveals That Defendant Illegally Shares App Users' Personally Identifying Information, Video Viewing Information, and Confidential Communications With Amplitude and Braze ............................. 7

            1.    Overview Of The Amplitude Service ............................. 10

            2.    Overview Of The Braze Service .................................... 11

        B.    Defendant Discloses App Users' Full Names And E-Mail Addresses To Amplitude and Braze .......................... 11

        C.    Defendant Discloses Information Identifying Which Specific Videos Were Requested And Obtained By Which Specific App Users to Amplitude and Braze ................ 13

D.  Defendant Aids, Agrees With, And Employs Amplitude's And Braze's Interception Of App Users' Confidential Communications, Or Otherwise Uses Amplitude and Braze To Record App Users' Confidential Communications ........................................ 14

IV.  DEFENDANT INTENTIONALLY AND KNOWINGLY DISCLOSES WEBISTE USERS' PERSONALLY IDENTIFIABLE INFORMATION AND VIDEO VIEWING INFORMATION TO META ........................................ 18

A.  Overview Of The Meta Tracking Pixel ...................................... 18

B.  Defendant Discloses To Meta Information Sufficient To Identify Which Specific Website Users Requested Or Obtained Which Specific Pre-Recorded Videos .................. 20

V.  DEFENDANT DISCLOSES PERSONALLY IDENTIFIABLE INFORMATION AND HEALTH INFORMATION TO THE THIRD PARTIES FOR MARKETING, ADVERTISING, AND ANALYTICS PURPOSES ................................................ 23

A.  Defendant Discloses App Users' Personally Identifiable Information, Video Viewing Information, And Personal Health Information To Amplitude For The Purpose Of Marketing, Advertising, And Analytics ........................................................ 23

B.  Defendant Discloses App Users' Personally Identifiable Information, Video Viewing Information, And Personal Health Information To Braze For The Purpose Of Marketing, Advertising, And Analytics .................. 26

C.  Defendant Discloses Website Users' Personally Identifiable Information And Video Viewing Information To Meta For The Purpose Of Marketing, Advertising, And Analytics ........................................ 28

VI.  DEFENDANT'S CONDUCT IS KNOWING AND INTENTIONAL ........................................................ 32

VII.  PLAINTIFFS' EXPERIENCES ........................................ 33

A.  Experience Of Plaintiff Ava Hoffman ........................................ 33

B.  Experience Of Plaintiff Shante Pierro ........................................ 35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    C.    Experience Of Plaintiff Daniela Zamor ....................................... 36

CLASS ALLEGATIONS ................................................................................. 37

CAUSES OF ACTION .................................................................................... 40

    Count I – Violation Of The VPPA (App) ................................. 40

    Count II – Violation Of The VPPA (Website) ........................... 42

    Count III – Violation Of The CIPA § 631 ............................... 43

    Count IV – Violation Of The CIPA § 632 ............................... 46

PRAYER FOR RELIEF ................................................................................. 47

JURY TRIAL DEMAND ............................................................................... 48

Plaintiffs Ava Hoffman, Shante Pierro, and Daniela Zamor ("Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and all others similarly situated. Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Defendant FitOn, Inc. ("FitOn" or "Defendant") for violating the Video Privacy Protection Act ("VPPA") and the California Information Privacy Act ("CIPA").

2. The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8 (1988). "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

3. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710.

4. With a similar focus on protecting individual privacy, CIPA § 631(a) prohibits a party from aiding, agreeing with, and/or employing a third party to eavesdrop on communications between parties without the consent of all parties to the communication. And CIPA § 632(a) prohibits any person from "us[ing] an electronic amplifying or recording device to eavesdrop upon or record" confidential communications.

5. Defendant owns and operates FitOn, a mobile application containing "free home exercise workout videos in pre-recorded format, personalized fitness plans

and guided meditations" (the "App").  The App is available on both Android[1] and iOS[2] mobile devices.  As used herein, the "App" shall refer to both the Android and iOS versions, unless otherwise specified.

6.    Defendant also operates the FitOn Website, fitonapp.com (the "Website") (collectively with the App, the "FitOn Video Platform"), that provides the same pre-recorded video content as the App.

7.    Unbeknownst to Plaintiffs and Class Members, Defendant knowingly and intentionally discloses their users' personally identifiable information—including a record of every video viewed by the user (on both the App and Website) and their personal health information (on the App)—to unrelated third parties: Amplitude and Braze (on the App) and Meta (on the Website) (collectively, the "Third Parties").  By doing so, Defendant violated the VPPA and CIPA.

8.    Plaintiffs bring this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA and CIPA §§ 631-632.

## THE PARTIES

9.    Plaintiff Shante Pierro is a natural person and citizen of California, residing in Stockton, California.

10.    Plaintiff Ava Hoffman is a natural person and citizen of Massachusetts, residing in Arlington, Massachusetts.

11.    Plaintiff Daniela Zamor is a natural person and a citizen of New York, residing in Stony Point, New York.

12.    Defendant FitOn, Inc. is a Delaware corporation with its principal place of business at 8605 Santa Monica Blvd. #16613, West Hollywood, California 90069.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

---

[1] https://play.google.com/store/apps/details?id=com.fiton.android.

[2] https://apps.apple.com/us/app/fiton-workouts-fitness-plans/id1442473191.

14.    This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

15.    This court has general personal jurisdiction over Defendant because Defendant's principal place of business is in California.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## FACTUAL ALLEGATIONS

### I.    THE VPPA AND THE CIPA PROTECT CONSUMER PRIVACY

#### A.    History And Overview Of The VPPA

17.    The impetus for the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court.  During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record.  Congress responded by passing the VPPA, with an eye toward the digital future.  As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone.  I think that is wrong.

S. Rep. 100-599, at 5-6 (cleaned up).

18.    In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming

services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones."  S. Rep. 112-258, at 2.

19.    The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider."  18 U.S.C. § 2710(b)(1).

20.    The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider."  18 U.S.C. § 2710(a)(3).

21.    A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

22.    Individuals who are "aggrieved" by a violation of the VPPA may bring an action for "not less than liquidated damages" of $2,500 per violation, in addition to other remedies.  18 U.S.C. §§ 2710(c)(1)-(2).

**B.    History And Overview Of The CIPA**

23.    The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

24.    The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas v. Clark*, 38 Cal. 3d 355, 363 (1985) (emphasis added, internal quotations omitted).  This restriction is based on the "substantial distinction … between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor*, whether that auditor

be a person or mechanical device." *Id.* at 361 (emphasis added).  Such "simultaneous dissemination" "denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements."  *Id.*; *see also U/S. Dept. of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 763 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

25.    As part of CIPA, the California Legislature introduced § 631(a), which prohibits any person or entity from (i) "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," (ii) "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or (iii) "us[ing], or attempt[ing] to use … any information so obtained."  These are "distinct and mutually independent patterns of conduct."  *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping.

26.    The California Legislature also enacted CIPA § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

27.    "[T]he California Supreme Court has also emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA."  *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).  "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation

1   that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL
2   8200619, at *19 (N.D. Cal. Aug. 12, 2016).

3       28.    Individuals may bring an action against the violator of CIPA §§ 631 and
4   632 for $5,000 per violation.  Cal. Penal Code § 637.3.

5   **II.    DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER**

6       29.    Defendant "is a leading digital wellness platform" that provides pre-
7   recorded workout videos and fitness courses, as well as nutrition, mindfulness, and
8   self-care guidance programs.[3]

9       30.    The App is available for download on both iOS and Android and is
10  available for use throughout the United States.  The Website can also be accessed and
11  is available for use throughout the United States

12      31.    The FitOn Video Platform provides pre-recorded home yoga and exercise
13  workout videos, personalized fitness plans and guided meditations.[4]

14      32.    Defendant's FitOn Video Platform hosts and delivers hundreds of pre-
15  recorded videos, a number of which are only available with a paid subscription.  All
16  FitOn Video Platform users, even those with free accounts, must create an account and
17  go through the FitOn Video Platform's sign-up process to view videos.

18      33.    When a user creates an account on the FitOn Video Platform, the FitOn
19  Video Platform prompts the user to enter personal information through a series of
20  questions as part of the account creation process, including the user's full name, email
21  address, birth year, gender, zip code, height, weight, and information about the user's
22  fitness and weight loss goals.

23      34.    Each user must provide all of this information to create an account and
24  access the content on the FitOn Video Platform.  A user cannot watch video content
25  on the FitOn Video Platform without creating an account.

26

27  _____

[3] https://fitonapp.com/.

28  [4] https://play.google.com/store/apps/details?id=com.fiton.android.

35.     Further, creating a paid account entitles a user to additional benefits, such as "premium music," "personalized meal plans" and "exclusive recipes," "unlimited offline downloads," and "real-time heart rate."[5]

36.     Users reasonably expect that this information will be obtained only by FitOn and only for the purpose of assisting with their fitness plan on the FitOn Video Platform.  They do not expect their private information—much less their sensitive health information like their height, weight, and fitness goals—to be shared with third parties.

**III.    DEFENDANT INTENTIONALLY AND KNOWINGLY DISCLOSES APP USERS' PERSONALLY IDENTIFIABLE INFORMATION, VIDEO VIEWING INFORMATION, AND PERSONAL HEALTH INFORMATION TO AMPLITUDE AND BRAZE**

**A.     Testing Reveals That Defendant Illegally Shares App Users' Personally Identifying Information, Video Viewing Information, and Confidential Communications With Amplitude and Braze**

37.     In July 2024, Bursor & Fisher, P.A. retained a private research company to review the App and conduct a dynamic analysis.  A "dynamic analysis" records the transmissions that occur from a user's device.

38.     The researchers tested what information (if any) was disclosed when a user enters information into or watches a pre-recorded video on the App.  The analysis revealed that Defendant discloses information to third parties sufficient to identify specific Class Members, view and learn their private communications, and learn the specific videos they watched.

39.     The analysis first established that Defendant incorporates multiple "software development kits" ("SDK") and "application programming interfaces" ("API") into its App.

40.     An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For

---

[5] https://fitonapp.com/pro/.

example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[6]

41.    APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[7]    An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[8]    APIs "enable[] companies to open up their applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[9]

42.    Defendant integrates into the App the Braze SDK and API (the "Braze Service"), which are owned and operated by a company of the same name.    Braze describes its Service as providing a "customer engagement platform."[10]

43.    Defendant also integrates into the App the Amplitude SDK and API (the "Amplitude Service"), which are owned and operated by a company of the same name. The Amplitude Service is a digital analytics platform that allows its clients like Defendant to "[s]ee everything that customers do, understand what drives growth, and accelerate business outcomes."[11]

---

[6] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[7] APPLICATION PROGRAMMING INTERFACE (API), IBM, https://www.ibm.com/cloud/learn/api.

[8] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[9] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[10] ABOUT BRAZE, BRAZE, https://www.braze.com/company/careers.
[11] BUILD GREAT DIGITAL PRODUCTS & EXPERIENCES, https://amplitude.com/digital-analytics-platform

44.    The dynamic analysis found that when a user views a pre-recorded video on the App on either an Android or iOS mobile device, Defendant transmits information sufficient to permit an ordinary person to identify a specific person's video-viewing behavior—as well as personal and confidential health information—to both third parties:

### Summary of Third-Party Exfiltration 🤖

| THIRD PARTY | VIDEO INFO | HEALTH INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|---|
| **Amplitude** | Video Title, Video ID, Video Events | Height, Weight, Fitness Goals | Email, Birth Year, Gender, Full Name, Username, City (estimated) | UserID, AAID |
| **Braze** | Video Title, Video ID, Video Events | Height, Weight, Fitness Goals | Email, Birthdate, Gender, Full Name, City (estimated) | UserID |

### Summary of Third-Party Exfiltration 

| THIRD PARTY | VIDEO INFO | HEALTH INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|---|
| **Amplitude** | Video Title, Video ID, Video Events | Height, Weight, Fitness Goals | Email, Birth Year, Gender, Full Name, Username, City (estimated) | UserID, DeviceID/IDFV |
| **Braze** | Video Title, Video ID, Video Events | Height, Weight, Fitness Goals | Email, Birthdate, Gender, Full Name, Username, City (estimated) | UserID, DeviceID/IDFV |

45.    Specifically, when a user signs up for an account and views a pre-recorded video on the App, Defendant discloses to Braze and/or employs Braze to intercept a user's: (i) e-mail address; (ii) full name; (iii) gender; (iv) birthdate; (v) city of residence; (vi) username; (vii) height; (viii) weight; (ix) fitness goals; (x) workout interactions (i.e., current BMI); (xi) Braze user ID; (xiii) the title of the specific video viewed; (xiv) the video ID for the specific video viewed; and (xv) the fact that the specific video was actually watched or viewed by the user (*e.g.*, "Start"). These disclosures are made in real time as the information is entered or pre-recorded video is played on the App.

46.     Further, when a user signs up for an account and views a pre-recorded video on the App, Defendant discloses to Amplitude and/or employs Amplitude to intercept a user's: (i) e-mail address; (ii) full name; (iii) gender; (iv) birthdate; (v) city of residence; (vi) username; (vii) height; (viii) weight; (ix) fitness goals; (x) workout interactions (*i.e.*, current BMI); (xi) Amplitude user ID; (xii) the title of the specific video viewed; (xiii) the video ID for the specific video viewed; and (xv) the fact that the specific video was actually watched or viewed by the user (*e.g.*, "Start").  These disclosures are made in real time as information is entered or a pre-recorded video is viewed on the App.

*1.     Overview Of The Amplitude Service*

47.     As Amplitude notes on its website, Amplitude is a "a digital analytics platform" that purports to "help every business optimize the business value of digital product innovation."[12]

48.     Once integrated into a developer's mobile application, the Amplitude Service allows an app developer to, among other features, analyze app data in real time, track unique users,[13] and generate reports on user activity to inform advertising campaigns.[14]

49.     As alleged in greater detail below, Defendant utilizes each and every one of these features of the Amplitude Service in their App and sends their consumers' PII, video-viewing information, and confidential communications to Amplitude, and/or employs Amplitude to intercept this information, to assist with Defendant's marketing, advertising, and analytics efforts.

---

[12] AMPLITUDE, https://amplitude.com/company.

[13] TRACK UNIQUE USERS, AMPLITUDE, https://amplitude.com/docs/data/sources/instrument-track-unique-users.

[14] UNDERSTANDING YOUR USERS' ACTIVITY, AMPLITUDE, https://amplitude.com/docs/get-started/understand-user-activity.

### 2.     Overview Of The Braze Service

50.    As Braze notes on its website, Braze is a "customer engagement platform" that "power[s] customer-centric interactions between consumers and brands in real-time."[15]

51.    Once integrated into a developer's mobile application, the Braze Service allows an app developer to, among other features, analyze app data in real time, conduct real-time targeted marketing campaigns,[16] and send personalized push notifications and in-app messages to mobile users.[17]

52.    As alleged in greater detail below, Defendant utilizes each and every one of these features of the Braze Service in their App and sends their consumers' PII, video-viewing information, confidential communications to Braze, and/or employs Braze to intercept this information, to assist with Defendant's marketing, advertising, and analytics efforts.

**B.    Defendant Discloses App Users' Full Names And E-Mail Addresses To Amplitude and Braze**

53.    A full name is self-evidently personally identifiable information because it is the name someone goes by in all public and private interactions in their life. Indeed, this is the exact information of Judge Bork's that was disclosed to the reporter that led to the VPPA's enactment.

---

[15] BRAZE, https://www.braze.com/ (last accessed Apr. 12, 2024).

[16] DATA & ANALYTICS, BRAZE, https://www.braze.com/product/data-and-analytics.

[17] MOBILE & WEB PUSH, BRAZE, https://www.braze.com/product/mobile-web-push; In-App & In-Browser Messaging, BRAZE, https://www.braze.com/product/in-app-in-browser-messages.

---

54.    An e-mail address is a unique string of characters that designates an electronic mailbox.  As industry leaders,[18] trade groups,[19] and courts agree,[20] an ordinary person can use an email address to uniquely identify another individual. Indeed, there exists multiple services that enable anyone with internet access and a credit card to look up who owns a particular e-mail address.[21]

55.    As the dynamic analysis establishes, when a user watches a pre-recorded video on the App, Defendant discloses users' full names and e-mail addresses to Amplitude and Braze.  Defendant also discloses its users' location by city in this same transmission, which further allows Amplitude and Braze to identify users:

//

//

//

//

//

//

//

//

//

//

---

[18] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[19] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[20] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[21] *See, e.g.*, www.beenverified.com.

```
"Email": "peppymay@yahoo.com",
"First Name": "Patricia",
"Last Name": "Santiago",
```

```
"dob": "1969-12-31",
"email": "peppymay@yahoo.com",
"first_name": "Patricia",
"gender": "f",
"last_name": "Santiago",
```

```
"City": "Pittsfield",
"Current BMI": "27.300000000000001",
"Email": "bravibraveary@gmail.com",
"First Name": "Patricia",
"Gender": "Female",
"Height": "59",
"Last Name": "Santiago",
```

```
"dob": "1984-03-03T05:00:00Z",
"email": "bravibraveary@gmail.com",
"first_name": "Patricia",
"gender": "f",
"home_city": "Pittsfield",
"last_name": "Santiago",
```

**CLOCKWISE FROM TOP LEFT – Excerpts of dynamic analysis showing:**

**(i) Defendant's disclosures of users' full name and e-mail address to Amplitude on the Android App;**

**(ii) Defendant's disclosures of users' full name and e-mail address (along with gender) to Braze on the Android App;**

**(iii) Defendant's disclosures of users' full name and e-mail address (along with city location, date of birth, and gender) to Braze on the iOS App; and**

**(iv) Defendant's disclosures to Amplitude of users' full name and e-mail address (along with city location, height, gender, and current BMI) to Amplitude on the iOS App.**

56.     Thus, Defendant discloses to Amplitude and Braze information sufficient to enable an ordinary person to identify the specific App user who is watching a pre-recorded video.

### C.     Defendant Discloses Information Identifying Which Specific Videos Were Requested And Obtained By Which Specific App Users to Amplitude and Braze

57.     The title of a pre-recorded video self-evidently discloses the specific video watched by a specific user.   Indeed, this is the exact information of Judge Bork's that was disclosed to the reporter that led to the VPPA's enactment.

58.     As the dynamic analysis establishes, when a user watches a pre-recorded video on the App, Defendant discloses the title of the video (in the below example, "Lower Body Blitz") to Amplitude and Braze.  In addition, Defendant discloses other information related to the video requested or obtained by the App user, including but not limited to: (i) the video ID; (ii) certain video interactions (*e.g.*, "Start," "Screen View," "Resume"); (iii) the category of the video or training session; and (iv) the name

of the trainer for the pre-recorded video.  This information is transmitted when, and

only when, an App user watches a pre-recorded video:



```
"event_properties": {
"Category": "Strength,Cardio,Muscle Defense...",
"ID": "457",
"Intensity": "2",
"Name": "Lower Body Blitz",
"Offline": "0",
"Screen Variant": "Image",
"Source": "Program Details Screen",
"Time Total": "1306",
"Trainer": "Breann Mitchell",
"Type": "on-demand"
},
"event_type": "Screen View: Workout Details",
```

```
"n": "Workout: Start",
"p": {
"Category": ["Strength","Cardio","Muscle Defense..."]
},
"First Workout": "0",
"ID": "457",
"Initiated": "Workout Detail",
"Intensity": "2",
"Locale": "en_US",
"Music Station ID": "",
"Music Station Name": "Original",
"Name": "Lower Body Blitz",
"Offline": "0",
"Program Name": "Supercharged Strength",
"Program Week": "1",
"Source": "Program Details Screen",
"Time": "1423",
"Time Total": "1306",
"Trainer": "Breann Mitchell",
"Type": "on-demand"
```

```
"event_properties": {
"Category": ["Meditation"],
"First Workout": "0",
"ID": "1469",
"Initiated": "Workout Detail",
"Intensity": "1",
"Music Station ID": "",
"Music Station Name": "Original",
"Name": "Gratitude Affirmations",
"Offline": "0",
"Source": "Browse - MEDITATION",
"Time": "1343",
"Time Total": "365",
"Trainer": "Kenta Seki",
"Type": "on-demand"
},
"event_type": "Workout: Start",
```

```
"n": "Workout: Start",
"p": {
"Category": ["Cardio","HIIT","Sessions"],
"First Workout": "0",
"ID": "1283",
"Initiated": "Workout Resume",
"Intensity": "3",
"Locale": "en_US",
"Music Station ID": "",
"Music Station Name": "Recommended",
"Name": "Super Sweaty Cardio",
"Offline": "0",
"Source": "Program - Resume",
"Time": "1338",
"Time Total": "928",
"Trainer": "Kenta Seki",
"Type": "move-based"
```

**CLOCKWISE FROM TOP LEFT – Excerpts of dynamic analysis showing:**

**(i) Defendant's disclosures of the title of the specific video watched by the user (along with other video information and interactions) to Amplitude on the Android App;**

**(ii) Defendant's disclosures of the title of the specific video watched by the user (along with other video information and interactions) to Braze on the Android App;**

**(iii) Defendant's disclosures of the title of the specific video watched by the user (along with other video information and interactions) to Braze on the iOS App; and**

**(iv) Defendant's disclosures of the title of the specific video watched by the user (along with other video information and interactions) to Amplitude on the iOS App.**

59.     Thus, Defendant discloses to Amplitude and Braze information sufficient

to enable an ordinary person to identify the specific pre-recorded video that is being

requested or obtained by a specific App user.

**D.     Defendant Aids, Agrees With, And Employs Amplitude's
And Braze's Interception Of App Users' Confidential
Communications, Or Otherwise Uses Amplitude and Braze
To Record App Users' Confidential Communications**

60.     When creating an account, which is mandatory to watch videos or access

any of FitOn's services, users are required to enter answers to a series of personal

questions, which ostensibly will help personalize the program to the needs of each individual.

61.    Users are prompted to enter personal demographic information, private health information, and information about their fitness goals and desired parameters for their exercise program.

62.    To be clear, users must affirmatively input this information into form fields to create an account.  This is not a situation where users are having their information automatically generated without their input.

63.    The dynamic analysis found that when a user creates an account on the App, Defendant employs or otherwise enables Amplitude and Braze to intercept in-transit (*i.e.*, contemporaneously with an App user entering the information), and/or uses the Amplitude Service and Braze Service to eavesdrop on and record, users' communications with the App.  These communications include users' personal health information, such as their height, weight, starting and current BMI, birth year/age (and, in some cases, full date of birth), and gender.  This information is then associated with an App user and disclosed to Amplitude and Braze every time a user watches a pre-recorded video on the App:

//
//
//
//
//
//
//
//
//
//
//

"Birth Year": "1984",
"City": "Pittsfield",
"Current BMI": "27.3",
"Gender": "Female",
"Height": "59.0 inch",
"Start BMI": "27.3",
"User Name": "patricias442"
…
"event_id": "17",
"event_properties": {
"Age": "40",
"Gender": "Female",
"Height": "59.0 inch",
"Start Weight": "135.0 lbs"

"Age": "40",
"Birth Year": "1984",
"City": "Pittsfield",
"Current BMI": "27.3",
"Gender": "Female",
"Height": "59.0 inch",
"Start BMI": "27.3"
},
"dob": "1984-03-03",
"user_id": "21360435"

"Age": "40",
"Birth Year": "1984",
"City": "Pittsfield",
"Current BMI": "27.300000000000001",
"Email": "bravibraveary@gmail.com",
"First Name": "Patricia",
"Gender": "Female",
"Height": "59",
"Last Name": "Santiago",
"Permission ATT": "authorized",
"Phone Verified": "true",
"Start BMI": "27.300000000000001",
"Start Weight": "135",

"Age": "40",
"Birth Year": "1984",
"City": "Pittsfield",
"Current BMI": "27.3",
"Gender": "Female",
"Height": "59",
"Permission ATT": "authorized",
"Phone Verified": "true",
"Start BMI": "27.3",
"Start Weight": "135",
"User Name": "pattycakes456",
"User State": "new"
},
"dob": "1984-03-03T05:00:00Z",

**CLOCKWISE FROM TOP LEFT – Excerpts of dynamic analysis showing:**

**(i) Amplitude's interception and/or recording of users' personal health information on the Android App;**

**(ii) Braze's interception and/or recording of users' personal health information on the Android App;**

**(iii) Braze's interception and/or recording of users' personal health information on the iOS App; and**

**(iv) Amplitude's interception and/or recording of users' personal health information on the iOS App.**

64.     On the iOS App specifically, Braze intercepts and/or records even more personal health information, including total weight loss, the user's "Fitness Goal," and ideal number of workouts and workout length per week:

```
"Current BMI": "27.3",
"Current Weight": "61.2",
"Fitness Goal": "Prenatal fit",
"Gender": "Female",
"Goal Weight": "",
"Groups": "1",
"Height": "59",
"Length": "12 weeks",
…
"Signup Success": "2024-06-26T17:32:00Z",
"Start BMI": "27.3",
"Start Weight": "135",
"Start of Program Week Day": "Wednesday",
"User Language": "en",
"User Locale": "en_US",
"User Name": "patricias219",
"User State": "new",
"Weight Lost": "0",
"Weight Measurement": "lbs",
"Weight Remaining": "",
"Workout Length": "15 - 20",
"Workouts Per Week": "3 - 4"
```

**Braze's interception and/or recording of users' additional personal health information on the iOS App**

65.    When Defendant uses the Amplitude Service and Braze Service on the App, they are not like tape recorders or "tools" used by one party to record the other. Instead, Amplitude and Braze—separate and distinct third-party entities from the parties to the conversation—eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties.  This is because Amplitude and Braze themselves are collecting the content of any conversation.  That data is then analyzed by Amplitude and Braze in the manner alleged above before being provided to any entity that was a party to the conversation (like Defendant).

66.    App users are not informed that their communications and private information are being contemporaneously intercepted and/or recorded by Amplitude and Braze, nor do App users provide their prior consent to the same.

## IV.  DEFENDANT INTENTIONALLY AND KNOWINGLY DISCLOSES WEBISTE USERS' PERSONALLY IDENTIFIABLE INFORMATION AND VIDEO VIEWEING INFORMATION TO META

### A.  Overview Of The Meta Tracking Pixel

67.  The Meta Tracking Pixel is a piece of code that Meta's clients, like Defendant, can integrate into their Website.  Once activated, the Meta Tracking Pixel "tracks the people and type of actions they take."[22]

68.  The Meta Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant.  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Meta.[23]

69.  When the Meta Tracking Pixel captures an action, it sends a record to Meta.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like Custom Audiences and Core Audiences.

70.  Clients such as Defendant can also build "Custom Audiences."[24]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."  With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[25]

71.  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  Advertisers can do this through two mechanisms:

[22] RETARGETING, META, https://www.facebook.com/business/goals/retargeting.

[23] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

[24] ABOUT CUSTOM AUDIENCES, META, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[25] ABOUT LOOKALIKE AUDIENCES, META, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

(i) by manually uploading contact information for customers; or (ii) by utilizing Meta's "Business Tools," which collect and transmit the data automatically.[26]

72.    The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[27]  However, Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[28]  Advertisers can even create their own tracking parameters by building a "custom event."[29]

73.    One such Business Tool is the Meta Tracking Pixel.  Meta offers this piece of code to advertisers, like Defendant, to integrate into their websites.  As the name implies, the Meta Tracking Pixel "tracks the people and type of actions they take."[30]  When a user accesses a website hosting the Meta Tracking Pixel, Meta's software surreptitiously directs the user's browser to simultaneously send a separate message to Meta's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data the Pixel is configured to collect.    This transmission is initiated by Meta code and concurrent with the

_____

[26] CREATE A CUSTOMER LIST CUSTOM AUDIENCE, META, https://www.facebook.com/business/help/170456843145568?id=2469097953376494.

[27] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[28] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[29] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[30] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load a website: the website's own code, and Meta's embedded code.

74. Defendant can control what user actions—or, as Meta calls it, "events"—the Meta Tracking Pixel will collect. The Meta Tracking Pixel can capture the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.[31] Defendant can also configure the Meta Tracking Pixel to track other events. Meta offers a menu of "standard events" from which advertisers like Defendant can choose, including what content a visitor views or purchases.[32] Defendant can also create its own tracking parameters by building a "custom event."[33]

75. Website developers like Defendant control how the Meta Tracking Pixel identifies Website visitors. The Meta Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[34] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[35] Pixel-specific data includes "the Pixel ID and cookie."[36]

**B.    Defendant Discloses To Meta Information Sufficient To Identify Which Specific Website Users Requested Or Obtained Which Specific Pre-Recorded Videos**

76. When a FitOn Video Platform user watches a pre-recorded video on the Website, Defendant discloses to Meta via the Meta Tracking Pixel (i) the Website user's Facebook ID; (ii) the specific reference number and category of the video being

---

[31] *See* ACCURATE EVENT TRACKING, META, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* BEST PRACTICES FOR META PIXEL SETUP, META, https://www.facebook.com/business/help/218844828315224?id=120537668283214.

[32] SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[33] ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, META, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[34] META PIXEL, META, https://developers.facebook.com/docs/facebook-pixel/.

[35] *Id.*

[36] *Id.*

requested and obtained; and (iii) the fact that the user actually watched the video at issue (*e.g.*, whether the user was browsing or watching the video and if and when the user "played" or "paused" the video):

77.    A "Facebook ID" is a unique and persistent numerical identifier—just like a social security number or driver's license number—that Facebook assigns to each Facebook user and that: (a) Facebook can use to identify the specific individual associated with the Facebook ID; and, moreover, (b) an ordinary person (not just Facebook) can use to identify the specific individual by simply appending the Facebook ID to the end of https://facebook.com/[Facebook ID]. For example, the Facebook ID for Mark Zuckerberg is 4. Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

78.    When a user requests or obtains a pre-recorded video on the Website, Defendant discloses the Website user's Facebook ID to Meta via the c_user cookie. The c_user cookie contains the consumer's unencrypted Facebook ID.

79.    FitOn assigns a unique video reference number to each of the videos on the FitOn Platform. For example, a particular workout video for a pilates high-intensity interval training program was assigned the video reference number "workout 22." This video reference number appears in the URL of the video on the Website, and is disclosed to Meta by FitOn as part of information transmitted by the Meta Pixel whenever a user accesses the webpage containing the video. During the class period, FitOn used a common URL naming protocol as follows:  https://app.fitonapp.com/ browse/workout/[numeric-video-reference-number].  Thus, an ordinary person with the video reference number can identify the videos the user browsed or watched by simply appending the video reference number to the common URL. So, in the above example, an ordinary person can figure out the video requested or obtained by the

Website user by typing in "https://app.fitonapp.com/browse/workout/22," which returns the pilates high-intensity interval training video.

80.    FitOn further discloses to Meta whether the user had merely requested, or in fact went on to watch, the specific video content. FitOn's disclosures did this in two ways. First, FitOn disclosed the URL of the accessed webpage to Meta, and FitOn's common URL naming protocol disclosed whether the user was browsing or watching the video. In particular, when a user first accessed a webpage containing a video, the URL (that was disclosed to Meta) indicated that the user was merely browsing the video: https://app.fitonapp.com/browse/workout/[numeric-video-reference-number]. If the user went on to watch the video, the URL (that was disclosed to Meta) transitioned to indicate that the video was in progress: https://app.fitonapp.com/inprogress/22. Second, FitOn also disclosed "event" data to Meta that indicated whether the user hit the "play" or "pause" button associated with the video.

81.    Thus, Defendant discloses to Meta information sufficient for an ordinary person to identify which specific Website users are requesting or obtaining which specific pre-recorded videos, and whether the Website user in fact watched the video.

82.    While the Website does not currently have the Meta Tracking Pixel on it, FitOn appears to use other tracking technologies on the Website,[37] and may disclose to those third parties information sufficient to identify which specific persons watched which specific pre-recorded videos.

---

[37] PRIVACY POLICY, https://fitonapp.com/privacy/ ("We use Cookies and similar tracking technologies to track the activity on Our Service and store certain information.").

## V. DEFENDANT DISCLOSES PERSONALLY IDENTIFIABLE INFORMATION AND HEALTH INFORMATION TO THE THIRD PARTIES FOR MARKETING, ADVERTISING, AND ANALYTICS PURPOSES

83.    Defendant discloses personally identifiable information and confidential communications to Amplitude, Braze, and Meta so they can help Defendant with marketing, advertising, and analytics.

84.    As alleged above, Amplitude, Braze, and Meta are designed to analyze FitOn Video Platform data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's revenue from their video-based marketing and advertising on the FitOn Video Platform. *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 32 (D. Mass. 2024) (disclosures to Braze for "marketing, advertising, and analytics [] do not fall within the [ordinary course of business] exception's narrow list of permissible uses") (cleaned up); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *7 (N.D. Cal. Aug. 10, 2012) (disclosures to Facebook for "[m]arket research and web analytics are not in the ordinary course of Hulu's business of delivering video content to consumers").

### A. Defendant Discloses App Users' Personally Identifiable Information, Video Viewing Information, And Personal Health Information To Amplitude For The Purpose Of Marketing, Advertising, And Analytics

85.    Amplitude describes itself as "a digital analytics platform" that purports to "help every business optimize the business value of digital product innovation."[38]

86.    Amplitude helps app developers like Defendant market, advertise, and analyze app data and analyze real-time user data in order to build precise audiences of "behavioral data" which "reveals how engagement with [a] product affects retention, conversion, revenue, and other business outcomes [its customers] care about."[39]

---

[38] AMPLITUDE, https://amplitude.com/company.

[39] IDENTIFY USERS WITH SIMILAR BEHAVIORS, AMPLITUDE, https://amplitude.com/docs/analytics/behavioral-cohorts.

87.    For instance, Amplitude offers an AI feature called "Ask Amplitude," which "uses [its clients'] taxonomy and business context to build and edit charts using natural language."[40]   In other words, Amplitude acquires, learns, and compiles its clients' end users' information into insights and actionable analytics.  These analytics are then used by app developers like Defendant to bolster their marketing and advertising efforts by improving customer engagement.

88.    Amplitude also provides a "Recommendation Engine" that "predict[s] which content, products, or services a customer is likely to consume or engage with" "based on their own data."  Specifically, Amplitude's Recommendation Engine based on, among other things, "[a] customer's past behaviors and history."  Notably, the Recommendation Engine "use[s] machine learning," which Amplitude trains and improves based on end-users' information, such as Defendant's App users.[41]

89.    The information Amplitude collects is not just from one source.  On the contrary, app developers like Defendant can integrate customer information from a variety of sources into Amplitude.  Using this information, app developers can then utilize Amplitude's analytics to create "cohorts" of customers with certain characteristics to "deliver insights into the frequency and duration of your users' engagement with your product"[42] and to export to other platforms for marketing.

90.    Amplitude conglomerates all of this data into user profiles, which it associates with identifiers like an Amplitude user ID and/or e-mail address.[43]

---

[40] AMPLITUDE ANALYTICS, https://amplitude.com/amplitude-analytics.

[41] WHAT IS A RECOMMENDATION ENGINE? HOW RECOMMENDERS WORK, https://amplitude.com/
blog/recommendation-engine.

[42] UNDERSTANDING YOUR USERS' ACTIVITY, AMPLITUDE, https://amplitude.com/
docs/get-started/understand-user-activity .

[43] IDENTIFY USERS WITH SIMILAR BEHAVIORS, AMPLITUDE, https://amplitude.com/
docs/analytics/behavioral-cohorts.

91.    As Amplitude collects more information however, the user profiles become even more detailed.  These detailed user profiles include "demographic[,] behavioral [and] algorithmic data," like the information collected from Plaintiffs,  to "maximize conversion rates" of targeted advertising.[44]

92.    Amplitude also uses the information it acquires for its own benefit.  For instance, Amplitude's Main Service Agreement between Amplitude and its customers like Defendant grants Amplitude the right to "use techniques such as machine learning in order to improve the Services, and Customer instructs Amplitude to process its Customer Data for such purpose."[45]   In other words, Amplitude is able to use the "Customer Data" it collects (*e.g.*, the information of Defendant's App users) to improve its AI functionality that is at the heart of many of Amplitude's services.

93.    Amplitude also admits that it uses "Subprocessors to Process Personal Data in connection with the provision of the Amplitude Services."[46]   This means Amplitude *further discloses* any information it acquires to other, unconsented-to third parties.  These include, but are not limited to, Amazon, Datadog, and OpenAI.[47]

94.    Defendant uses each and every one of the above-mentioned features of the Amplitude Service in Defendant's integration of the Amplitude Service into Defendant's App.  Thus, Defendant utilizes the Amplitude Service to analyze user data and target specific users or specific groups of users for advertisements, while Amplitude can use the information to improve its services and further disclose the information to other third parties.  All of this helps Defendant further monetize the App and maximize revenue by collecting and disclosing as much PII as possible to Amplitude through the Amplitude Service.

[44] AMPLITUDE AUDIENCES OVERVIEW, AMPLITUDE, https://amplitude.com/docs/data/audiences.

[45] AMPLITUDE, INC. MAIN SERVICE AGREEMENT, https://amplitude.com/msa#3-3.

[46] DATA PROCESSING ADDENDUM FOR TERMS OF SERVICE, https://amplitude.com/terms/dpa.

[47] AMPLITUDE SUBPROCESSOR LIST, https://www.amplitude.com/subprocessor-list.

**B.    Defendant Discloses App Users' Personally Identifiable Information, Video Viewing Information, And Personal Health Information To Braze For The Purpose Of Marketing, Advertising, And Analytics**

95.    Braze describes itself as a "customer engagement platform" that prides itself on providing "highly personalized, customized experiences" in exchange for customer data,[48] and provides a "marketing automation tools [that] enables brands to drive user engagement and retention through multi-channel campaigns."[49]

96.    Braze helps app developers like Defendant market, advertise, and analyze app data and analyze real-time user data in order to build precise audiences that can "[i]dentify, target and engage customers based on their likelihood to purchase or perform any other high value action."[50]

97.    The data Braze collects is not just from one source.  On the contrary, app developers like Defendant can integrate customer information from a variety of sources into Braze.  Using this information, app developers can then utilize Braze's analytics to obtain a "unified view" of their customers in order to "act on real-time and historical preferences, behaviors, conversion likelihood, and interactions across channels" to target them more effectively. [51]

---

[48] BRAZE, https://www.braze.com/.

[49] DATA PROCESSING ADDENUM (Aug. 2024), https://cdn.sanity.io/files/b7pblshe/ marketing-prod/51c1aa4cc9cf5feaf1c6048fb791e3a741f7e886.pdf.

[50] DATA & ANALYTICS, BRAZE, https://www.braze.com/product/data-and-analytics.

[51] *Id.*

98.     Braze conglomerates all of this data into user profiles, which it associates
with identifiers like a Braze user ID and/or e-mail address.[52]



99.     As Braze collects more information however, the user profiles become
even more detailed.   These detailed user profiles could include information related to
a user's location, gender, age group, operating system, actions taken on a website, and
even if a user has a credit card or not.[53]



100.   Notably, all of this information is not disclosed to Braze by default.
Instead, Braze only receives information such as user time zone and browser type by

---

[52] USER PROFILES, BRAZE, https://www.braze.com/docs/user_guide/engagement_
tools/segments/user_profiles/#access-profiles.

[53] See id.

default.[54]  Rather, app developers like Defendant must *specifically choose* to disclose additional information such as e-mail addresses and geolocation to Braze.[55]

101.  Braze also admits that it "engages third-parties who have access to and process customer personal data."[56] This means Braze *further discloses* any information it acquires to other, unconsented-to third parties.  These include, but are not limited to, Amazon and Google.[57]

102.  Defendant uses each and every one of the above-mentioned features of the Braze Service in Defendant's integration of the Braze Service into Defendant's App.  Thus, Defendant utilizes the Braze Service to analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements.  All of this helps Defendant further monetize the App and maximize revenue by collecting and disclosing as much PII as possible to Braze through the Braze Service.

## C.    Defendant Discloses Website Users' Personally Identifiable Information And Video Viewing Information To Meta For The Purpose Of Marketing, Advertising, And Analytics

103.  Defendant discloses a user's PII and video-viewing information to Meta via the Meta Tracking Pixel so that Meta can "personali[ze] content, tailor[] and measur[e] ads, and provid[e] a safer experience" for Website users.[58]

---

[54] SDK DATA COLLECTION, BRAZE, https://www.braze.com/docs/user_guide/data_ and_analytics/user_data_collection/sdk_data_collection/?redirected=true#personaliz ed-integration (last accessed Mar. 19, 2024).

[55] *Id.* ("Personalized Integration; integrators have the flexibility to collect data in addition to Automatically Collected Data.").

[56] BRAZE DATA PROCESSING ADDENDUM FAQs, https://www.braze.com/company/ legal/dpa.

[57] BRAZE SUBPROCESSORS, https://www.braze.com/company/legal/subprocessors.

[58] COOKIES POLICY, META, https://www.facebook.com/privacy/policies/cookies/ ?entry_point=cookie_policy_redirect&entry=0.

104.   Meta owns facebook.com and generates revenue by selling advertising space on that website, and other applications it owns, like Instagram.[59]   In 2021, Facebook generated $117 billion in revenue.[60]  Roughly 97% of that came from selling advertising space.[61]

105.   Meta sells advertising space by highlighting its ability to target users.[62]  Meta can target users so effectively because it surveils user activity both on and off its site.[63]   This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[64]   Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers like Defendant use to apply highly specific filters and parameters for their targeted advertisements.[65]

106.   Advertisers like Defendant can also build "Custom Audiences."[66]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used

---

[59] Mike Isaac, *Facebook's Profit Surges 101 Percent On Strong Ad Sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[60] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[61] *Id.*

[62] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[63] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[64] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[65] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[66] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[their] app or visited [their] website."[67]  With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[68]

107.   The Meta Tracking Pixel also allows Defendant "to track [its] website visitors' actions," which Meta calls conversion tracking.[69]  "Tracked conversions … can be used to analyze [Defendant's] return on ad investment."[70]

108.   Notably, "[e]ach time the Pixel loads, it automatically … track[s]" and records the URL that a Website user viewed.[71]  In other words, so long as Defendant has installed the Meta Tracking Pixel on the Website, anyone who views that webpage—meaning all Website users—"will be tracked using that" automatic URL tracker.[72]   And, as mentioned above, the tracked URL discloses to Meta the exact video(s) that a Website user views.  Indeed, Meta even warns advertisers such as Defendant to "make sure" the website URLs are specific enough that Defendant "can define visitor actions exclusively based on unique … website URLs."[73]

109.   "Once tracked, custom conversions"—such as the URL tracking tool— "can be used to optimize [Defendant's] ad campaigns"[74] through other Meta tools such

---

[67] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[68] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[69] CONVERSION TRACKING, META, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking.

[70] Id.

[71] CUSTOM CONVERSIONS, META, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking#custom-conversions.

[72] Id.

[73] Id.

[74] Id.

---

as Ads Insights.[75]  Notably, this part of Meta's functionality ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Meta's Conversion API endpoint." [76]

110.   After receiving information from advertisers like Defendant, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

111.   Meta confirms, in its "Meta Business Tools Terms,"[77] that it has the capability to use the information it collects for purposes other than recording it and conveying it to Defendant.  For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."  In other words, Meta can use the wiretapped information for its own "research and development," and to "protect" its own products and services.

112.   Meta can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[78]

113.   Further, Meta can use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[79]

---

[75] CUSTOM CONVERSIONS INSIGHTS, META, https://developers.facebook.com/docs/ meta-pixel/implementation/conversion-tracking#custom-conversions.

[76] *Id.*

[77] FACEBOOK, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[78] *Id.*

[79] *Id.*

114.   Defendant utilizes Meta's comprehensive array of tracking and analytics tools to optimize its marketing, advertising, and analytics—ultimately increasing its viewer base and subscription revenue.

## VI.   DEFENDANT'S CONDUCT IS KNOWING AND INTENTIONAL

115.   Based on the above, it is abundantly clear that Defendant *intentionally* and *knowingly* discloses FitOn Video Platform users' PII and video-viewing information to the Third Parties, or otherwise *willfully* and *intentionally* employs, uses, or otherwise enables the Third Parties to eavesdrop upon, record, and intercept the same.

116.   As to Amplitude and Braze specifically, Defendant's Head of Lifecycle Marketing, Lizzie Zeigler, hosted an "Ask Me Anything" in May 2022, where she discussed "all things customer engagement, Canvas, onboarding campaigns, and Amplitude and Braze."  Notably, Ms. Zeigler discussed "using both tools in concert together while also sharing some tips and tricks for creating a customer engagement strategy and leveraging product analytics to help drive conversions, growth, and revenue."[80]

117.   The "Ask Me Anything" promotion touted that "[b]y using Amplitude and Braze together, you're able to do deeper behavioral and product analysis, gauge the efficacy of segmentation and experimentation on the customer experience through Amplitude and make real-time adjustments in Braze, export behavioral cohorts directly from Amplitude to Braze or utilize Currents to export data from Braze to Amplitude."[81]

118.   As to all Third Parties, these services did not appear on the FitOn Video Platform by happenstance.  On the contrary, Defendant was required to contract and specifically pay for each service, and information regarding the services' functionality

---

[80] AMPLITUDE AND BRAZE ASK ME ANYTHING WITH FITON (May 17, 2022), http://atozmarketingsolutions.com/braze-and-amplitude-ama-with-fiton.html.

[81] *Id.*

is publicly disclosed by the Third Parties and/or described in the user agreements entered into by Defendant. In return, Defendant was then enriched by its partnership with each of the Third Parties, as the Third Parties enabled Defendant to better target and market to its users, which drove Defendant's revenue.

119.   Further, Defendant was aware it was disclosing PII and video-viewing information to the Third Parties, as it had to specifically configure each service to collect and receive that information. As alleged above, the Third Parties do not collect much of this sensitive information by default.

## VII.   PLAINTIFFS' EXPERIENCES

### A.   Experience Of Plaintiff Ava Hoffman

120.   In or around April 2024, Plaintiff Ava Hoffman downloaded the App on her Apple iPhone and created a paid FitOn account by entering information into the App as described above. Plaintiff Hoffman was in California when she downloaded, used, and communicated with the App.

121.   As Plaintiff Hoffman entered her personal information and private health information into the App (*i.e.*, in real time), Amplitude and Braze—as aided, agreed with, and employed by Defendant—wiretapped Plaintiff Hoffman's communications with Defendant while Plaintiff Hoffman was in California.

122.   Amplitude and Braze viewed and processed each and every one of Plaintiff Hoffman's communications with Defendant's App and used the information for data analytics and targeted advertising.

123.   Plaintiff Hoffman was on notice of any wiretapping when she began answering questions on Defendant's App, nor did she provide prior consent to the same. Last, neither Defendant nor Amplitude nor Braze procured Plaintiff Hoffman's prior consent to the wiretapping

124.   Plaintiff Hoffman did not discover that her communications had been wiretapped until July 2024.

125.   Plaintiff Hoffman used the App regularly from April 2024 to June 2024. During that time, she used the App to watch various pre-recorded videos.

126.   At all times relevant, Plaintiff Hoffman never consented, agreed, nor otherwise permitted the App to disclose her PII and video-viewing information to Amplitude and Braze.

127.   Likewise, Defendant never gave Plaintiff Hoffman the opportunity to prevent the App from disclosing her PII and video-viewing to Amplitude and Braze.

128.   Nevertheless, each time Plaintiff Hoffman viewed a pre-recorded video on the App, Defendant disclosed her PII and video-viewing information to Amplitude. Specifically, Defendant disclosed to Amplitude Plaintiff Hoffman's: (i) email address; (ii) full name; (iii) Amplitude ID; and (iv) video-viewing information in the form of the video title, video category, and the fact that Plaintiff Hoffman actually viewed a video for each specific video watched by Plaintiff Hoffman.  Using this information, Amplitude was able to identify Plaintiff Hoffman and attribute her video viewing records to an individualized profile of Plaintiff Hoffman in its databases.  Indeed, even an ordinary person could identify Plaintiff Hoffman using the data Defendant disclosed to Amplitude.  Plaintiff Hoffman's PII was also used to create a user profile that included Plaintiff Hoffman's activity on the App, which Defendant uses for marketing, advertising, and analytics purpose.

129.   In addition, each time Plaintiff Hoffman viewed a pre-recorded video on the App, Defendant disclosed her PII and video-viewing information to Braze. Specifically, Defendant disclosed to Braze Plaintiff Hoffman's: (i) e-mail address; (ii) full name; (iii) Braze user ID; and (iv) video-viewing information in the form of the video title, video category, and the fact that Plaintiff Hoffman actually viewed a video for each specific video watched by Plaintiff Hoffman.  Using this information, Braze was able to identify Plaintiff Hoffman and attribute her video viewing records to an individualized profile of Plaintiff Hoffman in its databases.  Indeed, even an ordinary person could identify Plaintiff Hoffman using the data Defendant disclosed to Braze.

Plaintiff Hoffman's PII was also used to create a user profile that included her activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

**B.    Experience Of Plaintiff Shante Pierro**

130.    In or around January 2020, Plaintiff Shante Pierro downloaded the App on her Apple iPhone and created a free FitOn account by entering information into the App as described above.  Later on, Plaintiff Pierro continued to use the FitOn App on her Android phone. Plaintiff Pierro was in Massachusetts when she downloaded, used, and communicated with the App.

131.    As Plaintiff Pierro entered her personal information and private health information into the App (*i.e.*, in real time), Amplitude and Braze—as aided, agreed with, and employed by Defendant—wiretapped Plaintiff Pierro's communications with Defendant while Plaintiff Pierro was in Massachusetts.

132.    Amplitude and Braze viewed and processed each and every one of Plaintiff Pierro's communications with Defendant's App and used the information for data analytics and targeted advertising.

133.    Plaintiff Pierro was on notice of any wiretapping when she began answering questions on Defendant's App, nor did she provide prior consent to the same.  Last, neither Defendant nor Amplitude nor Braze procured Plaintiff Pierro's prior consent to the wiretapping

134.    Plaintiff Pierro did not discover that her communications had been wiretapped until July 2024.

135.    Plaintiff Pierro used the App regularly from January 2020 to June 2024. During that time, she used the App to watch various pre-recorded videos.

136.    At all times relevant, Plaintiff Pierro never consented, agreed, nor otherwise permitted the App to disclose her PII and video-viewing information to third parties.

137.    Likewise, Defendant never gave Plaintiff Pierro the opportunity to prevent the App from disclosing her PII and video-viewing to third parties.

138.   Nevertheless, each time Plaintiff Pierro viewed a pre-recorded video on the App, Defendant disclosed her PII and video-viewing information to Amplitude. Specifically, Defendant disclosed to Amplitude Plaintiff Pierro's: (i) email address; (ii) full name; (iii) Amplitude ID; and (iv) video-viewing information in the form of the video title, video category, and the fact that Plaintiff Pierro actually viewed a video for each specific video watched by Plaintiff Pierro.  Using this information, Amplitude was able to identify Plaintiff Pierro and attribute her video viewing records to an individualized profile of Plaintiff Pierro in its databases.  Indeed, even an ordinary person could identify Plaintiff Pierro using the data Defendant disclosed to Amplitude. Plaintiff Pierro's PII was also used to create a user profile that included Plaintiff Pierro's activity on the App, which Defendant uses for marketing, advertising, and analytics purpose.

139.   In addition, each time Plaintiff Pierro viewed a pre-recorded video on the App, Defendant disclosed her PII and video-viewing information to Braze. Specifically, Defendant disclosed to Braze Plaintiff Pierro's: (i) e-mail address; (ii) full name; (iii) Braze user ID; and (iv) video-viewing information in the form of the video title, video category, and the fact that Plaintiff Pierro actually viewed a video for each specific video watched by Plaintiff Pierro.  Using this information, Braze was able to identify Plaintiff Pierro and attribute her video viewing records to an individualized profile of Plaintiff Pierro in its databases.  Indeed, even an ordinary person could identify Plaintiff Pierro using the data Defendant disclosed to Braze. Plaintiff Pierro's PII was also used to create a user profile that included her activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

## C.    Experience Of Plaintiff Daniela Zamor

140.   In or around January 2021, Plaintiff Daniela Zamor subscribed to the FitOn Platform.

141.   Plaintiff Zamor paid for her subscription to FitOn for two years, and thereafter continued to access her FitOn account to watch free video content.

142. During that time, Plaintiff Zamor: (a) accessed the FitOn Platform through both the App and the Website; (b) had a Facebook account; (c) was logged into her Facebook account; and (d) watched pre-recorded videos on the FitOn Platform on both the App and the Website.

143. Plaintiff Zamor's FitOn account history indicates that she watched at least 80 workout videos on the FitOn platform during the time period described above.

144. Through the systematic processes described herein, Plaintiff Zamor's video request and viewing history was disclosed to third parties, including Meta.

145. Plaintiff Zamor did not provide express written consent—in the form required by the VPPA—to the disclosure of her video request and viewing history to third parties.

## CLASS ALLEGATIONS

146. **App Class Definition:** Plaintiffs Hoffman and Pierro seek to represent a class of similarly situated individuals defined as all persons in the United States with a FitOn Video Platform account who watched a pre-recorded video on the App and had their PII and video-viewing information disclosed to a third party (the "App Class").

147. **Website Class Definition:** Plaintiff Zamor seeks to represent a class of similarly situated individuals defined as all persons in the United States with a FitOn Video Platform account who watched a pre-recorded video on the Website and had their PII and video-viewing information disclosed to a third party (the "Website Class").

148. **California App Subclass Definition:** Plaintiff Hoffman also seeks to represent a subclass of similarly situated individuals defined as all California residents with a FitOn Video Platform account who accessed the App while in California and had their PII and confidential communications transmitted to a third party (the "California App Subclass").

149.   The App Class, Website Class, and California App Subclass shall be collectively referred to as the "Classes."

150.   Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

151.   **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiffs do not know the exact number of members of the aforementioned Classes.  However, given the popularity of the FitOn Video Platform, the number of persons within the Classes is believed to be so numerous that joinder of all members is impractical.

152.   **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include but are not limited to:

(i)    whether Defendant disclosed Plaintiffs' and the Classes' PII to Amplitude, Braze, and Meta;

(ii)   whether Defendant's disclosures were committed knowingly;

(iii)  whether Amplitude and Braze—aided, agreed with, employed, or used by Defendant—intercepted, recorded, or eavesdropped upon Plaintiff Hoffman's and California App Subclass Members' confidential communications; and.

(iv)   whether Plaintiffs and the Classes are entitled to damages.

153.   **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of those of the Classes because Plaintiffs, like all members of the Classes, watched pre-recorded videos on the FitOn Video Platform and had their PII and video-viewing information disclosed to third parties.

154.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring and the CIPA.    Plaintiffs and their counsel are committed to vigorously prosecuting this class action.    Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Classes.    Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes.    Plaintiffs have raised viable statutory claims, or the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims.    If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

155.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.    Even if every member of the Classes could afford to pursue individual litigation, the court system could not.    It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.    Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.    By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes.    Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation Of The VPPA – App,
### 18 U.S.C. § 2710

156.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

157.    Plaintiffs Hoffman and Pierro bring this claim individually and on behalf of the members of the proposed App Class and California App Subclass against Defendant.

158.    Defendant is a "video tape service provider[s]" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provides videos (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via their App.

159.    Plaintiffs Hoffman and Pierro and App Class and California App Subclass Members are "consumers" as defined by the VPPA because they created a FitOn Video Platform account, and downloaded, installed, and watched pre-recorded videos on the App.  18 U.S.C. § 2710(a)(1).  Under the VPPA, therefore, Plaintiffs Hoffman and Pierro and App Class and California App Subclass Members are "subscribers" of "goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1); *see also Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 487-89 (1st Cir. 2016); *Salazar v. National Basketball Association*, --- F.4th ---, 2024 WL 4487971, at *14-16 (2d Cir. Oct. 15, 2024).

160.    Plaintiffs Hoffman and Pierro and App Class and California App Subclass Members requested and obtained pre-recorded videos on the App.  During these occasions, Defendant disclosed Plaintiffs Hoffman and Pierro's and App Class and California App Subclass Members' PII and video-viewing information to Amplitude and Braze.

161.    The information disclosed by Defendant to Amplitude and Braze

constitutes "personally identifiable information" (18 U.S.C. § 2710(a)(3)) because it enables an even ordinary person to identify which specific pre-recorded videos were requested and obtained by which specific App Class and California App Subclass Members, including but not limited to Plaintiffs Hoffman and Pierro.

162.   Defendant disclosed the PII and video-viewing information of Plaintiffs Hoffman and Pierro and App Class and California App Subclass Members to Amplitude and Braze "knowingly." 18 U.S.C. § 2710(b)(1). Further, such disclosures were not for "debt collection activities, order fulfillment, request processing, and the transfer of ownership," and therefore did not fall within the "ordinary course of business." 18 U.S.C. § 2710(a)(2).

163.   Defendant did not obtain Plaintiffs Hoffman and Pierro's and App Class and California App Subclass Members' PII and video-viewing information to third parties, including Amplitude and Braze, "in a form distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i). Nor were Plaintiffs Hoffman and Pierro and App Class and California App Subclass Members given the opportunity to prevent the disclosure of their PII and video-viewing to third parties, including Amplitude and Braze, "in a form distinct and separate from any form setting forth other legal or financial obligations," and where Plaintiffs Hoffman and Pierro and App Class and California App Subclass Members were provided with the "opportunity, in a clear and conspicuous manner … to withdraw on a case-by-case basis or to withdraw from ongoing disclosures." 18 U.S.C. § 2710(b)(2)(B)(iii).

164.   On behalf of themselves and the App Class and California App Subclass, Plaintiffs Hoffman and Pierro seek: (i) declaratory relief; (ii) equitable relief as is necessary to protect the interests of Plaintiffs Hoffman and Pierro and App Class and California App Subclass Members by requiring Defendant to comply with the VPPA's requirements; (iii) statutory damages of $2,500 for each violation of the VPPA

1    pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees, costs, and other

2    litigation expenses.

### COUNT II
### Violation Of The VPPA – Website,
### 18 U.S.C. § 2710

165.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

166.    Plaintiff Zamor brings this claim individually and on behalf of the members of the proposed Website Class against Defendant.

167.    Defendant is a "video tape service provider[s]" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provides videos (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via their App.

168.    Plaintiff Zamor and Website Class Members are "consumers" as defined by the VPPA because they created a FitOn Video Platform account and watched pre-recorded videos on the Website.  18 U.S.C. § 2710(a)(1).  Under the VPPA, therefore, Plaintiff Zamor and Website Class Members are "subscribers" of "goods or services from a video tape service provider."   18 U.S.C. § 2710(a)(1); *see also Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 487-89 (1st Cir. 2016); *Salazar v. National Basketball Association*, --- F.4th ---, 2024 WL 4487971, at *14-16 (2d Cir. Oct. 15, 2024).

169.    Plaintiff Zamor and Website Class Members requested and obtained pre-recorded videos on the Website.  During these occasions, Defendant disclosed Plaintiff Zamor and Website Class Members' PII and video-viewing information to Meta.

170.    The information disclosed by Defendant to Meta constitutes "personally identifiable information" (18 U.S.C. § 2710(a)(3)) because it enables an even ordinary person to identify which specific pre-recorded videos were requested and obtained by which specific Website Class Members, including but not limited to Plaintiff Zamor.

171.   Defendant disclosed the PII and video-viewing information of Plaintiff Zamor and Website Class Members to Amplitude and Braze "knowingly." 18 U.S.C. § 2710(b)(1).  Further, such disclosures were not for "debt collection activities, order fulfillment, request processing, and the transfer of ownership," and therefore did not fall within the "ordinary course of business."  18 U.S.C. § 2710(a)(2).

172.   Defendant did not obtain Plaintiff Zamor and Website Class Members' PII and video-viewing information to third parties, including Meta, "in a form distinct and separate from any form setting forth other legal or financial obligations."  18 U.S.C. § 2710(b)(2)(B)(i).  Nor were Plaintiff Zamor and Website Class Members given the opportunity to prevent the disclosure of their PII and video-viewing to third parties, including Meta, "in a form distinct and separate from any form setting forth other legal or financial obligations," and where Plaintiff Zamor and Website Class and California App Subclass Members were provided with the "opportunity, in a clear and conspicuous manner … to withdraw on a case-by-case basis or to withdraw from ongoing disclosures."  18 U.S.C. § 2710(b)(2)(B)(iii).

173.   On behalf of herself and the Website Class, Plaintiff Zamor seeks: (i) declaratory relief; (ii) equitable relief as is necessary to protect the interests of Plaintiff Zamor and Website Class by requiring Defendant to comply with the VPPA's requirements; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees, costs, and other litigation expenses.

## COUNT III
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631(a)

174.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

175.   Plaintiff Hoffman brings this claim individually and on behalf of the California App Subclass against Defendant.

176.   CIPA § 631(a) imposes liability for "distinct and mutually independent

patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

177.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a)

applies to Internet communications.").

178.    The Amplitude Service and Braze Service are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

179.    Amplitude and Braze are each "separate legal entit[ies] that offer[] [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, each Third Party had the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to Defendant.  Accordingly, Amplitude and Braze were each a third party to any communication between Plaintiff Hoffman and California Subclass Members, on the one hand, and Defendant, on the other.  *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

180.    At all relevant times, Amplitude and Braze willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents the electronic communications of Plaintiff Hoffman and California App Subclass Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

181.    At all relevant times, Defendant aided, agreed with, employed, or otherwise enabled the Amplitude and Braze to intercept the electronic consumers of Plaintiff Hoffman and California App Subclass Members.

182.    Plaintiff Hoffman and California App Subclass Members did not provide their prior consent to Amplitude and Braze's intentional interception, reading, learning, recording, collection, and usage of Plaintiff Hoffman's and California App Subclass Members' electronic communications.  Nor did Plaintiff Hoffman and California App Subclass Members provide their prior consent to Defendant aiding, agreeing with, employing, or otherwise enabling the same.

183.   The wiretapping of Plaintiff Hoffman and California App Subclass Members occurred in California, where Plaintiff Hoffman and California App Subclass Members accessed the App, and where the Amplitude and Braze—as enabled by Defendant—routed Plaintiff Hoffman's and California App Subclass Members' electronic communications to Amplitude and Brazes respective servers.

184.   Pursuant to Cal. Penal Code § 637.2, Plaintiff Hoffman and California App Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

**COUNT IV**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632(a)**

185.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

186.   Plaintiff Hoffman brings this claim individually and on behalf of the members of the proposed California App Subclass against Defendant.

187.   CIPA § 632(a) prohibits an entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio." Cal. Penal Code § 632(a).

188.   The Amplitude Service and Braze Service are "electronic amplifying or recording device[s]."

189.   At all relevant times, Defendant intentionally used the Amplitude Service and Braze Service to eavesdrop upon and record the confidential communications of Plaintiff Hoffman and California App Subclass Members.

190.   At all relevant times, the communications between Plaintiff Hoffman and California App Subclass Members, on the one hand, and the App, on the other, were confidential.  The communications included health and medical information such as height and body weight, which reasonable consumers prefer to keep private.

191.   When communicating with the App, Plaintiff Hoffman and California App Subclass Members had an objectively reasonable expectation of privacy.  Plaintiff Hoffman and California App Subclass Members did not expect that Defendant would intentionally use an electronic amplifying or recording device to eavesdrop upon and record their confidential communications.

192.   Plaintiff Hoffman and California App Subclass Members did not consent to Defendant's intentional use of an electronic amplifying or recording device to eavesdrop upon or record their confidential communications.

193.   Pursuant to Cal. Penal Code § 637.2, Plaintiff Hoffman and California App Subclass Members have been injured by the violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, on behalf of themselves and all others similarly situated, as follows:

(a)   For an order certifying the Classes pursuant Fed. R. Civ. P. 23, naming Plaintiffs as representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b)   For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)   For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)   An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded; and

(g) For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of any and all issues so triable.

Dated: October 22, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ L. Timothy Fisher*
        L. Timothy Fisher

L. Timothy Fisher (SBN 191626)
Joshua R. Wilner (SBN 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            jwilner@bursor.com

*Attorneys for Plaintiffs*